UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ALEXANDER GIANNAKAKIS,<br><br>Defendant. | Criminal No.  21-cr-10271<br><br>Violations:<br><br>Count One: False Statements<br>(18 U.S.C. § 1001(a)(2))<br><br>Count Two: Falsifying, Concealing, and Covering Up a Material Fact by Trick, Scheme, and Device<br>(18 U.S.C. § 1001(a)(1))<br><br>Count Three: Concealment of Records in a Federal Investigation<br>(18 U.S.C. § 1519)<br><br>Count Four: Tampering with Documents and Objects<br>(18 U.S.C. § 1512(c)(1))<br><br>Count Five: Tampering with an Official Proceeding<br>(18 U.S.C. § 1512(c)(2))<br><br>Forfeiture Allegations:<br>(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)) |

## INDICTMENT

At all times relevant to this Indictment:

### Introductory and General Allegations

1. The Defendant, ALEXANDER GIANNAKAKIS, was a 32-year-old contractor who provided security at the United States Embassy in Sweden and, when in the United States, lived intermittently with his parents in Quincy, Massachusetts.

1

2. GIANNAKAKIS's younger brother also lived with GIANNAKAKIS's parents in Quincy. His brother became a suspect in multiple arsons, as detailed below, and is identified herein as "the suspect" or "the suspected arsonist." The suspect is not identified herein by name because, as explained below, he died in September 2020.

3. The Federal Bureau of Investigation ("FBI") is a federal agency that investigates federal crimes. The local FBI office in Chelsea, Massachusetts has a squad that investigates civil rights crimes and also a Joint Terrorism Task Force ("JTTF") that investigates matters of international and domestic terrorism. The JTTF consists of FBI agents, other federal criminal law enforcement officers, and also state and local law enforcement officers who are deputized as federal law enforcement officers.

## The Arsons

4. In and around February 2020, the suspected arsonist became the prime and only suspect in a joint investigation involving the FBI's civil rights squad, the FBI's JTTF, and state and local police departments concerning four fires set at Jewish-related institutions around the Boston metropolitan area: the first during the evening of May 11, 2019 at the Chabad Center-Arlington in Arlington, Massachusetts; the second at the same location during the evening of May 16, 2019; the third within an hour or two of the second fire, at the Chabad Lubavitch Jewish Center of Needham in Needham, Massachusetts; and the fourth during the evening of May 26, 2019, at a Jewish-affiliated business in Chelsea, Massachusetts. All four fires caused minor exterior damage before being extinguished. Despite causing only minor damage, these fires traumatized the Jewish community in and around Boston.

5.  Those investigating the fires suspected that all four fires had been set intentionally, with the second, third, and fourth fires likely set using a flammable liquid to accelerate or speed up the escalation of the fire. Consequently, they began investigating the fires as potential hate crimes and acts of domestic terrorism as well as criminal acts of arson.

6.  The investigations proceeded on two tracks: one investigation into the first three fires, and a separate investigation into the fourth fire. In May 2019, the FBI immediately opened an investigation into the first three fires and worked on it with local and state law enforcement agencies. At the same time, the FBI also started working with the U.S. Attorney's Office on a newly-opened grand jury investigation into the first three fires. In February 2020, the FBI learned about the fourth fire and an ongoing local and state investigation into it. The FBI subsequently began investigating that fire and whether it was set by the same person or persons as the three Chabad Center fires, as discussed below. At the same time, the federal grand jury investigation expanded to include the fourth fire.

7.  Both investigations lacked an immediately identifiable suspect. The first three fires had no eyewitnesses, no fingerprint evidence, and no surveillance video footage from the surrounding areas that was clear enough to identify a particular person. The large amounts of electronic evidence that the investigators gathered yielded few clues. The fourth fire had some eyewitnesses who saw a suspicious person near the fire. When that person was confronted, he ran away. The eyewitnesses' descriptions of this person were helpful, but did not identify any specific individual.

8.  When the suspicious person ran away from the fourth fire, he discarded a metal can that was labeled as containing acetone, a highly-flammable liquid. Officials at the scene found

3

the metal can, took it into evidence, and submitted it to the Massachusetts State Police for fingerprint analysis.

9. In February 2020, the Massachusetts State Police found fingerprints on the can and identified them as belonging to the suspect. Thereafter, as described below, the federal grand jury and local, state, and federal law enforcement officers investigated whether the suspect was responsible for setting not just the fourth fire, but also the first three fires as well.

### The Independent Investigation Into the Suspect and Violent, Anti-Jewish Ideology

10. Throughout 2019, independent of the investigations into the four fires, the FBI's JTTF was investigating whether a group of people in and around the District of Massachusetts was planning criminal activity in support of their racially-motivated, violent extremist ideology.

11. One of the people under investigation was GIANNAKAKIS's younger brother, whom the JTTF only later realized was the suspected arsonist.

12. In November 2019, approximately six months after the fourth fire, the suspect was hospitalized and remained in a coma until his death.

13. GIANNAKAKIS learned about this shortly thereafter. On or about November 24, 2019, GIANNAKAKIS entered the United States in part to help deal with the suspect's affairs.

14. In early January 2020, before the FBI had connected the suspect to the fires, members of the FBI's JTTF and a state police detective unaffiliated with the JTTF interviewed GIANNAKAKIS's mother at her home in Quincy. The purpose of the interview was to investigate whether the suspect or his associates planned to commit acts of violence in furtherance of their ideology. During the interview, the suspect's mother confirmed the suspect's anti-Semitic views. She also provided investigators some documents that included one handwritten page that

4

purported to be the cover page to a charter for a group that the JTTF agents believed consisted of individuals who might use violence against Jews to further the group's racially-motivated, violent extremist ideology.

15.  On or about January 14, 2020, GIANNAKAKIS left the United States and returned to Sweden.

16.  About nine days later, the JTTF learned from the suspect's mother that GIANNAKAKIS had taken the suspect's electronics (cellphone, laptop, etc.), sketches, writings, and mail from the suspect's bedroom and brought them to Sweden.

### The Arson Investigation Focuses on the Suspect and GIANNAKAKIS's Possession of His Electronics

17.  In and around late February 2020, the FBI and other law enforcement officers who were investigating the first three arsons became aware of the fourth fire and the recent identification of the suspect's fingerprints on the can discovered near that scene.

18.  Thereafter, they began investigating whether the suspect was also responsible for setting the first three fires. They suspected him of setting all four fires because of their similarities: (a) they were all set in May 2019 at Jewish or Jewish-affiliated institutions; (b) they were all set at the base of the buildings' exteriors; and (c) three of the four were likely set using an accelerant. In addition, the suspect's physical appearance was generally consistent with a person depicted in video surveillance footage collected near the first and third fires, as well as with some eyewitnesses' descriptions of the person who had discarded the can containing the possible accelerant after the fourth fire.

19.  From all of the above facts, including the suspected arsonist's reported ideology, the FBI concluded that he had likely set the fires as acts of domestic terrorism.

20. On or about March 14, 2020, GIANNAKAKIS flew from Sweden to the United States. After arriving in the United States, at New York's John F. Kennedy Airport, GIANNAKAKIS talked with Custom and Border Protection ("CBP") officers. During this conversation, GIANNAKAKIS admitted that he had taken the suspect's electronics with him to Sweden, that he had tried to access their contents but had been unable to do so, that he now had the electronics with him, and that he planned to travel on to Quincy, Massachusetts. After speaking to CBP, GIANNAKAKIS left the airport and traveled to Quincy.

21. After the FBI learned that GIANNAKAKIS had re-entered the United States, had the suspect's electronics with him, and planned to stay in Quincy, it obtained a federal warrant to search the suspected arsonist's former residence in Quincy, where agents understood that GIANNAKAKIS would be staying. Among other things, the warrant authorized federal investigators to search for and seize evidence relating to all four fires and anti-Jewish animus and motivation to commit acts of violence.

22. The FBI executed the search warrant with the assistance of a local law enforcement officer on or about March 20, 2020. In the suspect's bedroom, investigators found a jacket and other clothing that was consistent with clothing worn by the person of interest captured in surveillance footage from the first and third fires. They also found anti-Semitic writings by the suspect, including swastikas and statements such as "EIN LAND EIN VOLK, EIN FÜHRER," which, translated from the German, means "one country, one people, one leader" and is similar to Nazi Germany's slogan of "Ein Volk, ein Reich, ein Fuhrer." Some of the suspect's other writings included the following statements: "A world without Jews, is a world without scum. Something we should aim for," and "We must kill, we must kill all Jews. That is simply essential."

They also found an unopened bottle of a flammable liquid that was later scientifically analyzed and determined to be consistent with trace evidence found at the second and third fires.

<u>GIANNAKAKIS's False Statements and Obstruction</u>

23. At the beginning of the search, GIANNAKAKIS was not at the family residence. To further their domestic terrorism investigation, however, JTTF agents located GIANNAKAKIS nearby, talked with him, and invited him to go back to the residence while the search was ongoing, which he did. He was not under arrest, and talked with the agents voluntarily.

24. JTTF agents talked with GIANNAKAKIS about the suspect, whether the suspect had anti-Semitic views, who the suspect's friends were, whether the suspect was connected to any racially-motivated violent extremist groups, whether GIANNAKAKIS had taken the suspect's property overseas, whether GIANNAKAKIS had the suspect's property with him, and whether GIANNAKAKIS knew about the fires and the suspect's connection to them.

25. During the search, JTTF agents asked GIANNAKAKIS whether the suspect's property might be found at any other locations, to which he responded "no." JTTF agents then asked him whether the family had a storage unit. GIANNAKAKIS responded that his parents had a storage unit at a storage facility nearby.

26. GIANNAKAKIS drove to the storage facility and met the JTTF agents there. GIANNAKAKIS used a security code to enter the facility, admitted the JTTF agents into the facility, led them to storage unit 4099, and opened it for them. GIANNAKAKIS told the agents that the Giannakakis family used this storage unit, but that he maintained and controlled access to the unit. The agents then searched the unit with GIANNAKAKIS's consent. They found nothing related to their investigation.

7

27. After the search of storage unit 4099, the JTTF agents asked GIANNAKAKIS where else the suspect might keep his (the suspect's) property. GIANNAKAKIS responded that there were no other locations.

28. Relying on these statements, the JTTF agents ended their search and left the storage facility.

29. As GIANNAKAKIS well knew, his statements and actions concerning the storage unit and his statement that there was no other location that stored the suspect's property were intentionally false and misleading because:

   a. GIANNAKAKIS had access to two storage units at the storage facility and purposefully showed the agents only unit 4099.

   b. GIANNAKAKIS concealed from the JTTF agents a second storage unit at the very same facility, unit 4016, which he himself had leased and allowed the suspect to use, and on which the suspect was listed as an authorized user;

   c. GIANNAKAKIS concealed from the JTTF agents that this second storage unit that he knew was used by the suspect contained items relevant and material to their investigation such as t-shirts with a swastika depicted on the front; a box with the suspect's name on it; the suspect's passport; a notebook with the suspect's name on the cover and a swastika drawn inside; and a black backpack containing a bottle of cyanide (a lethal poison), which belonged to the suspect.

   d. GIANNAKAKIS had visited both units the night before the search, and both units were on the same floor of the facility, yet he did not tell the JTTF agents about unit 4016 and intentionally lied about and concealed its existence.

30. GIANNAKAKIS deliberately lied about the second storage unit and concealed it from the JTTF in order to prevent JTTF agents from seeing and seizing the suspect's property there.

31. Two days later, on or about March 22, 2020, GIANNAKAKIS returned to the storage facility without the FBI, entered unit 4016—the unit that he had concealed from the JTTF two days earlier—and removed from it items belonging to the suspect that were relevant and material to the FBI's ongoing arson investigation, including the backpack and the bottle of cyanide.

32. Later that evening, GIANNAKAKIS departed the United States and flew to Sweden. As of the date of this Indictment, he has not returned to the United States.

## COUNT ONE
## False Statements
## (18 U.S.C. § 1001(a)(2))

The Grand Jury charges:

33. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 32 of this Indictment.

34. On or about March 20, 2020, in the District of Massachusetts, the defendant,

### ALEXANDER GIANNAKAKIS,

in a matter involving domestic terrorism within the jurisdiction of the executive branch of the Government of the United States, did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation, that is, he told federal law enforcement agents that there were no locations other than the suspected arsonist's residence in Quincy and storage unit 4099 that contained items belonging to the suspected arsonist, when, in fact, GIANNAKAKIS then knew of another storage unit, storage unit 4016, that contained items belonging to the suspected arsonist.

All in violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT TWO
Falsifying, Concealing, and Covering Up a Material Fact by Trick, Scheme, and Device
(18 U.S.C. § 1001(a)(1))

The Grand Jury further charges:

35. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 32 of this Indictment.

36. On or about March 20, 2020 and continuing through on or about March 22, 2020, in the District of Massachusetts, the defendant,

## ALEXANDER GIANNAKAKIS,

in a matter involving domestic terrorism within the jurisdiction of the executive branch of the Government of the United States, did knowingly and willfully falsify, conceal, and cover up by trick, scheme, and device a material fact from federal law enforcement officers, that is, the defendant: (a) concealed the fact that there was a second storage unit, unit 4016, that contained items belonging to the suspected arsonist; (b) misled federal law enforcement officers by showing them only storage unit 4099 and not storage unit 4016; (c) lied to federal law enforcement officers when he stated that there were no locations other than the suspected arsonist's residence in Quincy and storage unit 4099 that contained items belonging to the suspected arsonist; and (d) after the search conducted by federal law enforcement officers on or about March 20, 2020, removed objects belonging to the suspected arsonist from storage unit 4016 on or about March 22, 2020.

All in violation of Title 18, United States Code, Section 1001(a)(1).

## COUNT THREE
### Concealment of Records in a Federal Investigation
### (18 U.S.C. § 1519)

The Grand Jury further charges:

37. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 32 of this Indictment.

38. On or about March 20, 2020 and continuing through on or about March 22, 2020, in the District of Massachusetts, the defendant,

### ALEXANDER GIANNAKAKIS,

did knowingly conceal and cover up a document with the intent to impede, obstruct, and influence an investigation and proper administration of a matter that the defendant knew and contemplated was within the jurisdiction of the Federal Bureau of Investigation, a department and agency of the United States, and a federal grand jury in the District of Massachusetts, that is, the defendant: (a) concealed the fact that there was a second storage unit, unit 4016, that contained a notebook with writings of the suspected arsonist; (b) misled federal law enforcement officers by showing them only storage unit 4099 and not storage unit 4016; and (c) lied to federal law enforcement officers when he stated that there were no locations other than the suspect's residence in Quincy and storage unit 4099 that contained items belonging to the suspected arsonist.

All in violation of Title 18, United States Code, Section 1519.

## COUNT FOUR
### Tampering with Documents and Objects
### (18 U.S.C. § 1512(c)(1))

The Grand Jury further charges:

39. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 32 of this Indictment.

40. On or about March 20, 2020 and continuing through on or about March 22, 2020, in the District of Massachusetts, the defendant,

### ALEXANDER GIANNAKAKIS,

did corruptly destroy, conceal, and cover up documents and other objects, and attempted to do the same, with the intent to impair the documents' and other objects' integrity and availability for use in an official proceeding, that is, a federal grand jury investigation, by (a) concealing the fact that there was a second storage unit, unit 4016, that contained items belonging to the suspected arsonist; (b) misleading federal law enforcement officers by showing them only storage unit 4099 and not storage unit 4016; (c) lying to federal law enforcement officers by telling them that there were no locations other than the suspect's residence in Quincy and storage unit 4099 that contained items belonging to the suspected arsonist; and (d) after the search conducted by federal law enforcement officers on or about March 20, 2020, removing objects belonging to the suspected arsonist from storage unit 4016 on or about March 22, 2020.

All in violation of Title 18, United States Code, Section 1512(c)(1).

## COUNT FIVE
### Tampering with an Official Proceeding
### (18 U.S.C. § 1512(c)(2))

The Grand Jury further charges:

41. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 32 of this Indictment.

42. On or about March 20, 2020 and continuing through on or about March 22, 2020, in the District of Massachusetts, the defendant,

### ALEXANDER GIANNAKAKIS,

did corruptly obstruct, influence, and impede an official proceeding, that is, a federal grand jury investigation, by: (a) concealing the fact that there was a second storage unit, unit 4016, that contained items belonging to the suspected arsonist; (b) misleading federal law enforcement officers by showing them only storage unit 4099 and not storage unit 4016; (c) lying to federal law enforcement officers by telling them that there were no locations other than the suspect's residence in Quincy and storage unit 4099 that contained items belonging to the suspected arsonist; and (d) after the search conducted by federal law enforcement officers on or about March 20, 2020, removing objects belonging to the suspected arsonist from storage unit 4016 on or about March 22, 2020.

All in violation of Title 18, United States Code, Section 1512(c)(2).

FORFEITURE ALLEGATIONS
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

43. Upon conviction of one or more of the offenses set forth in Counts Four and Five, the defendant,

ALEXANDER GIANNAKAKIS,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

44. If any of the property described in Paragraph 43, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant—

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 43 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United

States Code, Section 2461(c).

A TRUE BILL.

Deputy FOREPERSON

SCOTT L. GARLAND
JASON A. CASEY
ASSISTANT UNITED STATES ATTORNEYS
DISTRICT OF MASSACHUSETTS

District of Massachusetts: September 14, 2021
Returned into the District Court by the Grand Jurors and filed.

/s/ Lisa Belpedio, 4:02 pm
DEPUTY CLERK