**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **NO. 1:21-cr-10271** |
| | ) | |
| **ALEXANDER GIANNAKAKIS** | ) | |

**SENTENCING MEMORANDUM OF ALEXANDER GIANNAKAKIS**

November 23, 2019 began as a day like any other. It was the Tuesday before Thanksgiving. Although Alexander had moved from the U.S. to Sweden two years prior, he was planning on hosting a small celebratory 'Thanksgiving' style dinner with friends in the cozy apartment he shared with his girlfriend in the Stockholm suburbs. Since settling permanently in Sweden, Alex had been building the life of his dreams. He was studying Swedish and working in a research lab, a fulfilling job given his goals of pursing higher education and a career in the sciences or medicine. He and his girlfriend were living together and planning to buy their first home. And most importantly, Alex had some exciting news to share – he was about to become a father. Alex and his girlfriend were pregnant, expecting their first child, a baby girl, that coming June 2020. What better way to tell their friends the good news then at a small American Thanksgiving dinner at their home?

Then the call from Alexander's mother came in. Alex could barely understand her over the phone, as Karima struggled to communicate the unthinkable. Between anguished sobs and breaks in his mother's voice, Alex was able to piece together a few critical, horrible facts. His mother and his only little brother, James Ramy, younger than him by almost a decade, had gotten into an argument. His little brother had shut himself in his bedroom in the home he and their mother shared in Quincy, Massachusetts. And then, in his bedroom, his little brother had taken a

gun and shot himself, point blank, in the head. While his attempted suicide somehow hadn't killed him, his brother had been rushed to Boston Medical Center in critical condition, placed on life-support, and was in a coma. He was 23 years old.

The aftermath of his little brother's suicide attempt marks the most painful and destabilizing period of Alex's life. And it is within the wake of this tragedy, four months after his brother's suicide attempt, while his brother remained hospitalized in a coma, that Alex committed his offense conduct in this matter. As is addressed below, Alex's obstruction offenses were not driven by extremist ideology and hateful bigotry, but were motivated by an impulsive, shortsighted, and desperate attempt to protect his brother's memory, which had been devastated by the tragic suicide attempt and the subsequent discovery by Alex and his family that his brother had previously committed several arsons at local Jewish facilities in Massachusetts. Alex remains deeply remorseful for his choices and actions underlying his obstruction offenses. He takes full responsibility for them and understands the very real harms that have stemmed from his decision to conceal and tamper with records and the investigation related to his brother's 2019 arsons.

Mr. Giannakakis submits this memorandum to assist the Court in sentencing him for the offenses of concealment of records in a federal investigation, in violation of 8 U.S.C. § 1519, tampering with documents and objections, in violation of 18 U.S.C. § 1512(c)(1), and tampering with an official proceeding, in violation of 18 U.S.C. § 1512(c)(2) – offenses he has pled guilty to and takes full responsibility for. For the reasons set forth below, he asks this Court impose a sentence consistent with the parties' Rule 11(c)(1)(C) plea agreement: a sentence of thirty-six (36) months of imprisonment, followed by three (3) years of supervised release. Such a sentence

is "sufficient, but not greater than necessary" given the nature of his Mr. Giannakakis' offense, his personal history, and other reasons properly considered under 18 U.S.C. §3553(a).

1. **Nature and Characteristics of Mr. Giannakakis**

Growing up, Alex's earliest years were based in his home state of Pennsylvania. Alex's father, a dual U.S. and Greek citizen who worked as an electrical engineer and government contractor, had a career that took his family all over the world. In his first eighteen years, Alex and his family lived in various countries in Asia and the Middle East. *PSR* at ¶ 73. Settling in Cairo, Egypt for Alex's high school years, Alex attended and graduated from the British International School in Cairo, the valedictorian of his class. *PSR* at ¶ 91.

Alex's success in childhood and high school were not the by-product of an overly privileged or protected life. Changing schools, cultures, and countries frequently was often a stressful and overwhelming experience. And while Alex's days outside his home often including a myriad of challenges inherent to navigating new languages, cultures, and social experiences, *see PSR* at ¶ 73, his home life was often an unsafe place of turmoil and fear. Domestic abuse was the fifth member of Alex's small family. *PSR* at ¶ 75. His father's abuse of Alex's mother began shortly after Alex's birth. By the time Alex was a toddler, he too because a victim of his father's violence and verbal and physical outbursts. *Id*. As Alex aged, Alex's younger brother James Ramy weathered the brunt of their father's wrath. Witnessing his father's abuse of his younger brother, Alex would attempt to intervene, placing himself in between his father and little brother in the middle of fights, and trying to act as a buffer between his brother and father. *Id*.

Alex's role as a protector and caregiver to his little brother continued throughout their childhood and adolescence.[1] With an almost ten-year age span between them, Alex's relationship

---

[1] A photograph and Alexander and his brother when they were children in attached as Exhibit A.

to his younger brother was more akin to that of parent than sibling. Although the two brothers were extremely close growing up, Karima Giannakakis recalls "Alex was more like a father to him than a brother, taking care of him and supporting James Ramy and trying to make up for what my husband lacked." *See Support Letters of Friends and Family*, p. 2, attached as *Exhibit B*.

Despite challenges during Alex's formative years, those closest to him recount a smiling and cheerful boy and an exuberant, caring, and lively young man who excelled academically and socially. As a member of the diverse and multicultural international high school, his friends describe his ability to bring people from different walks of life together, who used his energy to lift up his peers and cheer them on. *Exhibit B*, p. 10. As his long-term friend Christina McGregor recalls:

> "If we were at a sports event - guess who's loud voice you'd hear shrieking your name and cheering you on while you played? Who's voice you'd hear screaming your name, or chanting for the girl's team during a volleyball or football tournament? ALEX. It would ALWAYS be Alex. Cheering alongside, motivating us and also comforting if we lost, or were too hard on ourselves and didn't achieve what we wanted, he'd be there to reassure, give a pep talk, and lift our spirits."

*Exhibit B, p.12*. Those who know Alex best recount his welcoming and altruistic nature, describing Alex as someone who "always believed in in helping people and lifting others around him", *Exhibit B*, p. 5, whether that be volunteering in a hospital as a young man, or creating a program, while still in high school, to support local Sudanese refugees and provide them with critical education and language skills. Another long-term childhood friend, Ahmed Ismail, writes:

> "[Alex] role modelled the pursuit of success as a means to take care of his family, friends, and community. Lastly, I will never forget his courage and capacity to show care for people while we were in high school. With the difficulties in Sudan, an influx of Sudanese refugees took refuge in a church near our school campus. Seeing their suffering, and with a concern for their future, Alex was able to make a difference. He created a program which enabled refugees to attend after hour classes on our campus. Students would volunteer to teach math, languages and skills to refugees enabling them

4

to integrate in society and create value through the skills they acquired. His capacity to care and show kindness was not transactional by any means but truly a key part of his character that continues to today."

*Exhibit B, p.10.*

Critically, friends and family echo similar impressions of Alex as a fundamentally inclusive and open person. One who never exhibited or harbored prejudices or biases against others. Indeed, within Alex's own family, his Egyptian Muslim mother and Greek Orthodox Christian father raised their sons in manner that embraced multicultural and religious inclusion. As his mother Karima describes, her sons were raised in a secular home "that celebrated the best of both cultures" and had friends "from all walks of life and different ethnicities, religions, and cultures". *Exhibit B*, p.1. "Our family was not perfect, but we always embraced viewpoints of tolerance and inclusion, and these are the values I taught to both of my sons." *Id*.

Moving to the United States alone after high school to attend the University of Pennsylvania– Alex experienced battles with mental health and clinical depression as he tried to adjust to the culture shock of a life back in the United States, separated from family. Graduating college in 2012,[2] *PSR* at ¶ 91, Alex remained in the U.S. for another five years, working as a firefighter and medic, before ultimately pursuing jobs in the field of scientific research, driven by his interests in science and hope to pursue higher education and a career in the medical field. S*ee PSR* at ¶¶ 93, 99-101.

In 2017, at age 30, Alexander relocated permanently to Sweden, while his parents and brother remained in Massachusetts. In Sweden, Alex continued his career path in the sciences, building his life and later, his new family, in Stockholm. *See PSR* at ¶¶ 96-98. On the date of his

---

[2]    Various recommendations documenting Alexander's work and efforts during and after his college career are attached for the Court's review as *Exhibit C; see also PSR* at ¶¶ 102-103.

5

little brother's suicide attempt in November 2019, Mr. Giannakakis was 32 years old. He and his partner were expecting their first child, his daughter Ophilia. As an expectant new father with a promising future and career, Alex was charting a life for himself and family that felt positive and promising. *See PSR* at ¶ 76.

Nothing can put into words or capture the devastation a loved one's suicide brings. As the presentence report and letters from friends and family document, his brother's November 2019 suicide attempt, prolonged 10-month hospitalization in a coma, and ultimate passing in September 2020 were seismic and tragic events that fundamentally impacted Alex's life. *PSR* at ¶ 77. Compounding the overwhelming nature of this period was the fact that Alex's father was also seriously ill and nearing the end of his life. *Exhibit B,* pp. 2-3. Hospitalized at the time of James Ramy's suicide attempt, Alex[3] and his mother also managed the care and treatment for his father, until his father's ultimate passing in February 2021. *Id.*; *see also PSR* at ¶ 79.

When speaking of the past, Alexander naturally organizes his responses about his life into two distinct time-periods: life before his brother's suicide attempt in November 2019 and life after. In that one instant, the very fabric that held together Alexander's concept of the world, and his family's world, unraveled. For the past five years, since that day, nothing in Alex's or his family's lives have ever been the same. Despite his incarceration and separation from his family over the last three years, Alexander has focused on self-improvement and growth. He has remained as present a father as he can be in his young daughter's life[4] and plans to return to

---

[3]    From of time of James Ramy's attempted suicide in November 2019 and passing (in September 2020), through the time of his father's illness and passing (in February 2021), Alex served as the health care proxy for both his little brother and father. *See PSR* at 77.

[4]    While detained at Wyatt, pursuant to a Swedish Family Court Order, Mr. Giannakakis engages in twice-weekly video calls with his daughter in Sweden. *PSR* at ¶ 81. At present, Mr. Giannakakis is engaged in on-going litigation in Swedish Family Court regarding these visitation

Sweden as soon as possible to resume his role as a dedicated, active father and caregiver in her life.[5] *See PSR* at ¶¶ 81-82. His mother, with whom he shares an exceptionally close relationship, plans to reside with her son (and granddaughter) once the family is reunited in Sweden, enabling Alex to support and care for her - given her recent declining health and more serious medical issues. *See PSR* at ¶¶ 76, 78.

Alexander's letters of support are replete with sentiments of his personal growth during the last thirty-six months of his detention, and speak to his genuine efforts at self-reflection, self-improvement, and a desire to return to his community as a caring and productive friend, family member, and community member. *See generally, Exhibit B*.

Additionally, over the last five months, in further pursuit of meaningful self-growth and a desire to take ownership for his offending and harms, Alexander has met with Rabbi Toba Spitzer, the senior Rabbi of Congregation Dorshei Tzedek in Newton, Massachusetts. As her letter expresses, "[Alex] has expressed to me his deep sadness over his brother's actions, his own desire to reflect on the antisemitism that both he and his brother have been exposed to in their lives, and a desire to take responsibility for his own past behaviors and grow meaningfully as a person." Engaging in discussions regarding (among other things) the origins and impacts of antisemitism, Rabbi Toba has "found Alex very eager to learn, and he has asked me for more reading on these topics. He is open-minded and exhibits real care and kindness in his responses." *See Letter of Rabbi Toba Spitzer*, attached as *Exhibit D*. At present, Rabbi Spitzer is working to connect Alex to her rabbinic contacts in Sweden, where he hopes to engage in volunteer

---

rights, to address on-going issues regarding his ex-wife limiting his daughter's placement on the calls. *PSR* at ¶¶ 81, 89. He is represented by counsel in the matter and the case is pending. *Id*.

[5]     Photographs of Alexander and his daughter are attached as Exhibit E.

opportunities supporting the local Jewish Community. Alex and Rabbi Toba have planned a third meeting at the end of this month, to continue developing these volunteer plans and to continue his work and efforts in healing and accountability. *Id*.

## 2. Nature and Characteristics of the Offense and Procedural History of the Criminal Case

The May 2019 underlying offenses in this matter, the arsons committed by Alexander's younger brother James Ramy, are a source of deep shame and pain for Alexander and for his family. In May 2019, at the time of the little brother's offenses, Alexander was living in Sweden. *PSR* at ¶ 11. Neither he, nor his family, had knowledge of the brother's actions underlying the arsons.

James Ramy's attempted suicide occurred approximately six months after his arsons. It was only then, after his little brother's subsequent coma and hospitalization, that Alexander first learned the truth about the depths of his brother's serious mental illness, his disturbing personality changes and degraded mental health, and the electronic shock therapy treatments he had been receiving at MGH Hospital. *PSR* at ¶ 77; *Exhibit B*, p. 2. In the wake of James Ramy's suicide and mental illness, the family also discovered the depths of James Ramy's troubling antisemitic and white supremist thought processes and preoccupations. In January 2020, in connection with what she believed was questioning related to a follow up of James Ramy's suicide, Alexander's mother Karima shared with officers' information about her youngest son's increasingly dysregulated antisemitic beliefs and thought processes that Jewish people were to blame for his struggles. *See PSR* at ¶ 31.

Four months after the suicide attempt, in March 2020, Alexander traveled to Massachusetts to care for his (hospitalized and comatose) brother, his ailing father, and support his mother. *PSR* at ¶ 77. During this trip, federal agents executed a search warrant at Alexander's

mother's home in Quincy (where James Ramy had lived) and seized (among other things) personal notebooks with writing reflecting antisemitism from James Ramy's bedroom. *PSR* at ¶ 32.

In the context of the March 20, 2020 search, Alexander voluntarily spoke with agents. *PSR* at ¶ 24. It was during this discussion that Alexander first learned his brother was the target suspect in a federal investigation involving the May 2019 arsons. *Id*. Alexander's choice on March 20th not to show investigating agents the storage unit containing his younger brother's belongings – which included his brother's mentally ill antisemitic writings and propaganda- and Alexander's removal of his brother's property from the unit the following day, are decisions he regrets with deep remorse and humility.

In the wake of his brother's suicide, Alexander was wrought with guilt and preoccupied by feelings of helplessness, believing he had failed to save and protect his brother in the moments his brother had needed it most. His choices to shield his brother's shameful personal property and effects from agents were impulsive, emotional decisions. They are decisions Alex made in the midst of overwhelming grief, spurred by his basic instinct and desire to protect his brother's memory from further shame and devastation. They are choices he regrets immensely and accepts full responsibility and accountability for. He understands his choices caused lasting and harmful repercussions in the community, in ways he never wished or intended.

After Alexander's discussion with agents in March 2020, he returned to Sweden (where his partner was, at that time, eight months pregnant). Given Covid lockdowns and restrictions, he remained in Sweden, working[6] and attending to his responsibilities as a new father, until he was

---

[6]     *See PSR* at ¶¶ 96-97.

arrested in Sweden on February 16, 2022, pursuant to a provisional arrest warrant related to the instant matter and his January 2021 indictment in this case. *PSR* at ¶ 1.

Alexander has remained detained, in a single unbroken period of custody, since his arrest on this case on February 16, 2022. *Id*. While incarcerated in Sweden pending extradition on this matter, Alexander was detained in extremely restrictive conditions.[7] *See PSR* at ¶ 41. However, while incarcerated on the unrelated Swedish gun conviction[8] he engaged in programming and notably, psychological treatment, receiving a diagnosis for Post Traumatic Stress Disorder ("PTSD") and participating in one-on-one mental health counseling. *PSR* at ¶¶ 86-87. Since his extradition to the U.S. on February 2, 2024, he has continued to engage in programming, including classes in parenting, anger management, cognitive behavioral therapy, and preparing for success after prison (PSAP),[9] has incurred no disciplinary reports, and has been independently pursing his Swedish language studies with a tutor.[10] *See PSR* at ¶ 7.

He takes full responsibility for his offenses and entered his guilty plea, pursuant to the parties Rule 11(c)(1)(C) plea agreement,[11] to Counts 3-5 of the Indictment on November 18, 2024. *PSR* at ¶ 2. Currently, Mr. Giannakakis has accumulated approximately 23 months of credit for time he has spent incarcerated on this matter in both Sweden and at the Wyatt Detention Facility. *PSR* at p.2; ¶¶ 1, 6, 68.

---

[7]     Mr. Giannakakis reports he was held in solitary confinement in Sweden during this time, without the ability to engage in programming, recreation, basic hygiene, or social interactions with other individuals.

[8]     The programming and mental health treatment he engaged in while incarcerated in Sweden occurred while detained on the unrelated firearms conviction in Sweden. *See PSR* at ¶ 86-87.

[9]     Documentation of programming at Wyatt is attached as *Exhibit F*.

[10]    A letter from his Swedish language teacher, documenting his progress, is attached as *Exhibit G*.

[11]    The parties binding Rule 11(c)(1)(C) plea agreement is docketed at D.E. 50.

### 3. Presentence Report and Guideline Assessment

Mr. Giannakakis agrees with Probation's presentence report guideline assessment, except for the adjustment pursuant to U.S.S.G. § 3C1.1. *PSR* at ¶ 57. For the reasons articulated in his objections to the presentence report, Mr. Giannakakis renews his objection and arguments to a two-point enhancement for an 'escape' attempt under § 3C1.1. *PSR* at p. 39, *Defense Objections No. 4-5*.

### i.    No Chapter Three Victim Adjustment is Applicable in This Case

Mr. Giannakakis stands before this Court, having pled guilty and been convicted of three obstruction offenses in May 2020; one count of concealment of records in a federal investigation, in violation of 8 U.S.C. § 1519, one count of tampering with documents and objections, in violation of 18 U.S.C. § 1512(c)(1), and one count of tampering with an official proceeding, in violation of 18 U.S.C. § 1512(c)(2). Mr. Giannakakis has never been charged, nor accused of participating, in any way, with the underlying arson offenses perpetrated by his severely mentally ill brother a year prior, on two separate days in May 2019. As such, no Chapter Three guideline adjustments premised on his brother's underlying arsons are applicable to Mr. Giannakakis' case. The defense agrees with federal probation's determination that neither the record before the Court nor the interpretation of the guidelines support a Chapter Three victim adjustment under § 3A1.1(a). *See PSR* at pp. *35-36*.

The question of whether a Chapter Three victim adjustment applies in Mr. Giannakakis's case is premised on what guideline controls the analysis of a potential USSG § 3A1.1[12]

---

[12]    U.S.S.G § 3A1.1 addresses potential enhancements for 'Hate Crimes' (§3A1.1(a)) and for 'Vulnerable Victims' (§ 3A1.1(b)(1)). U.S.S.G § 3A1.1(a) (Hate Crimes) states: "If the finder of fact at trial or, in the case of a plea of guilty or nolo contendere, the court at sentencing determines

adjustment. As properly determined by federal probation in this matter, no Chapter Three victim adjustments apply in Mr. Giannakakis' case because the correct lens under which to evaluate the applicability of a Chapter Three adjustment is the U.S.S.G § 2X3.1 guideline, and not, as the government seemingly contends, the U.S.S.G §2K1.4 arson guideline.

Calculation of Mr. Giannakakis's guidelines begins with the U.S.S.G § 2J1.2 'obstruction of justice' guideline. *PSR* at ¶ *52*. His controlling guideline, is, however, § U.S.S.G § 2X3.1 (the 'accessory after the fact' guideline), as 2J1.2(c)(1)[13] mandates a cross-reference to U.S.S.G § 2X3.1 because Mr. Giannakakis' offense, which involved obstructing the investigation or prosecution of a criminal offense, results in a offense level *greater* than that determined under the § 2J1.2 guideline. U.S.S.G § 2J1.2(c)(1)(emphasis added).

This 'referenced' § 2X3.1 offense guideline not only controls Mr. Giannakakis' Chapter Two offense level analysis, but also determines any applicable Chapter Three Adjustments. Section 1B1.5(c) of the Guidelines, entitled "Interpretation of References to Other Offense Guidelines", provides explicit guidance in a scenario such as Mr. Giannakakis'. It states:

> "if the offense level is determined by a reference to another guideline under subsection (a) or (b)(1) above, the adjustments in Chapter Three (Adjustments) ***also*** are determined in respect to the ***referenced*** offense guideline**,** except as otherwise expressly provided**."**

---

beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation of any person, increase by 3 levels." USSG § 3A1.1(a). USSG § 3A1.1(b)(1) (Vulnerable Victim) states, in relevant part: "If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels."

[13]     § 2J1.2(c)(1) states "[i]f the offense involved obstructing the investigation or prosecution of a criminal offense, apply §2X3.1 (Accessory After the Fact) in respect to that criminal offense, **if the resulting offense level is greater than that determined above**." U.S.S.G § 2J1.2(c)(1) (emphasis added).

§1B1.5(c) (emphasis added). Thus, pursuant to § 1B1.5(c), § 2X3.1 is the default guideline for determination of Chapter Three adjustments in Mr. Giannakakis' case.

Nothing in § 2X3.1 'expressly provides' for Chapter Three Adjustments to be determined under any other guideline or suggests that Chapter Three Adjustments should instead be determined by the 'underlying offense' to which a defendant is convicted of being an accessory. As such, the appropriate lens under which to analyze a § 3A1.1 Chapter Three adjustment remains § 2X3.1. Application Note 1 to § 2X3.1 is in no way contradictory. Note 1 narrowly addresses the definition of an 'underlying offense' for purposes of calculating the *Chapter Two base offense level* under § 2X3.1, and further directs the calculation of the *Chapter Two offense level* to encompass the base offense level of the underlying offense plus "any applicable 'specific offense characteristics' that were known, or reasonably should have been known, by the defendant." U.S.S.G § 2X3.1, application Note 1. Critically, nothing in Note 1 'expressly' addresses Chapter Three adjustments. Because, plainly, § 3A1.1 Adjustments are not Chapter Two 'specific offense characteristics', Note 1's reference to "any applicable 'specific offense characteristics' that were known, or reasonably should have been known, by the defendant" cannot be interpreted as referring (expressly or otherwise) to Chapter Three adjustments.[14] Given

---

[14]    In its sentencing memorandum, the Government references § 2X3.1 Application Note 1, and its internal reference to Application "Note 10" to USSG § 1B1.3 (Relevant Conduct), to support its argument that a § 3A1.1(a) Chapter Three adjustment applies. *See Government Sentencing Memorandum, footnote 2*. The correct reference in § 2X3.1 Application Note 1 is to Application Note 9 of USSG § 1B1.3 (Relevant Conduct).

   § 2X3.1 Application Note 1 (and its reference to Note 9 of USSG § 1B1.3 (Relevant Conduct)) specifically address the definition of "underlying offense" and provide direction on how, under § 2X3.1, one is to calculate a 2X3.1 Chapter Two offense level, by "apply[ing] the base level plus any applicable specific offense characteristics that were known, or reasonably should have been known, by the defendant; *see* Application Note 9 of the Commentary to §1B1.3 (Relevant Conduct)." U.S.S.G. § 2X3.1 Application Note 1.

   Nothing in this note (or in its reference to Note 9 of USSG § 1B1.3, which states "in the case of solicitation, misprision, or accessory after the fact, the conduct for which the defendant is

that nothing within the § 2X3.1 guideline 'expressly provides' for Chapter Three adjustments to be determined in an alternative manner, the correct lens of analysis for a Chapter Three USSG § 3A1.1 adjustment in Mr. Giannakakis' case is § 2X3.1. See §1B1.5(c).

Under § 3A1.1(a), a Chapter Three 'hate crime' adjustment is applicable:

> "If the finder of fact at trial or, in the case of a plea of guilty or nolo contendere, the court at sentencing determines beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation of any person, increase by 3 levels."

U.S.S.G § 3A1.1(a).

The plain language of the Guideline indicates that the words "defendant" and "offense of conviction" in § 3A1.1(a) refer to the defendant being sentenced (Mr. Giannakakis) and the offenses he has been convicted of (Record Concealment, Tampering with Documents and an Official Proceeding). Thus, in Mr. Giannakakis's case, to apply such a Chapter Three adjustment, determined by the referenced § 2X3.1guideline, the Court would have to find – beyond a reasonable doubt – that Mr. Giannakakis *himself* "intentionally selected any victim or any property as the object of [his] offense[s] of conviction", namely his March 2020 offenses of concealment of records in a federal investigation, tampering with documents and objections, and tampering with an official proceeding, specifically because of *his own hate crime motivation* towards another, that "of the actual or perceived race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation of any person." U.S.S.G § 3A1.1(a).

As identified by federal probation, the victims in Mr. Giannakakis' case are "the United

---

accountable includes all conduct relevant to *determining the offense level* for the underlying offense that was known, or reasonably should have been known, by the defendant") provides *any* direction or authority on calculating Chapter Three Adjustments.

States and/or society at large." *PSR at* p. 36. No evidence in this case supports a finding that Mr. Giannakakis committed his own May 2020 obstruction offenses because *he himself* harbored a hate crime motivation against another. Nor can the evidentiary requirement of proof beyond a reasonable doubt, a necessary pre-requisite for a § 3A1.1(a) adjustment, be met.

Lastly, the Government's cited case law offers no support for a § 3A1.1(a) Chapter Three adjustment in Mr. Giannakakis' case. *United States v. Gonzalez* is not controlling on the question of the applicability of a § 3A1.1(a) enhancement within the context of a § 2X3.1guideline, because *Gonzalez* did not raise this issue of whether a § 3A1.1(a) Chapter Three 'hate crime' adjustment applied (within the § 2X3.1guideline context) and the 11th Circuit did not address it. Instead, *Gonzalez* addresses the application of "specific offense characteristics for discharge of a firearm, physical restraint of victims, a substantial risk of bodily injury to law enforcement, or reckless endangerment during flight", and the defendant's argument against their application "because there was no evidence that she knew that the Waffle House robbery had involved those elements." *United States v. Gonzalez*, 449 F. App'x 841, 844 (11th Cir. 2011). The issues and holding in *Gonzalez* therefore hold scant applicability to the instant matter, especially given the fact that a § 3A1.1(a) Chapter Three adjustment requires special evidentiary requirements (including proof beyond a reasonable doubt). *See* USSG § 3A1.1(a), Application Note 1.

Further, the Government's reading of *United States v. Harris* misstates the relevant holding of the Fifth Circuit. In *Harris*, the defendant was charged and convicted of obstruction/accessory-after-the-fact offenses related to underlying offenses of bank robbery and receiving stolen money. *United States v. Harris*, 104 F.3d 1465, 1476 (5th Cir. 1997).  Pursuant to § 2J1.2(c)(1), the cross-referenced § 2X3.1guideline controlled the calculation of the defendant's guidelines. In analyzing the applicability of a Chapter Three adjustment for 'official

victim' under § 3A1.2(a), the 5th Circuit determined that no § 3A1.2(a) 'official victim' adjustment could apply, but not because, as the government asserts, "the defendant was unaware of the victim's official status". *See Government Sentencing Memo.*, p. 4. It is simply a mischaracterization of *Harris* to state, as the government does, that "had the evidence shown the defendant was aware of the robbery victim's official status when he acted as an accessory after the fact, therefore, the Fifth Circuit would have concluded that the "official victim" enhancement *did* apply under the accessory guideline. *Id.*

Instead, what the Fifth Circuit concluded was that no § 3A1.2(a) 'official victim' applied, "because the appellant's "offense of conviction," i.e., accessory after the fact, was not motivated by the government employee status of [the Police Officer Victim]." *Harris*, 104 F.3d 1465, 1476. Under the Fifth Circuit's analysis, the defendant's 'awareness' of whether the relevant individual was an 'official victim' had no bearing on whether or not a § 3A1.2(a) adjustment applied. The court clearly stated that the enhancement cannot apply because the offense of conviction – accessory after the fact – was not motivated by the victim's official status, regardless of whether he was aware of it or not. *Id.* at 1476. What is relevant to this present case is the Fifth Circuit's confirmation that "offense of conviction" means the offense of the conviction for the defendant being sentenced to the accessory after the fact offenses. It does not mean the offense of conviction for the underlying act.

Like *Harris*, the analysis of a § 3A1.1(a) 'hate crime' adjustment for Mr. Giannakakis requires a focus on Mr. Giannakakis' own accessory after the fact offenses, and whether *he* possessed the necessary *mens rea* (a hate crime motivation) in committing his own offenses of conviction. It is not, as the government seemingly suggests, a

question of whether Mr. Giannakakis, at the time of his accessory after the fact offenses in March 2020, "was aware of his brother's hate crime motivation" in commission of the brother's underlying arson offenses.

ii.    No Grouping Adjustment under § 3D1.4

The defense agrees with federal probation's determination that neither the record before the Court nor the interpretation of the guidelines support a three-point Grouping adjustment under §3D1.4. *See PSR at pp. 35-36*.

The government's proposition that under USSG § 3D1.4, the underlying arson offenses trigger a 3-point grouping increase to Mr. Giannakakis's total offense level is misplaced and unsupported by case law[15] and the guidelines. As Federal Probation clearly articulates, Application Note 3 to USSG § 1B1.5 (which discusses the interpretation of references to other offense guidelines) squarely controls the grouping determination in this matter. *See PSR at p. 36*. Application Note 3 to USSG § 1B1.5 states that when a guideline section (here, § 2X3.1(a)(1)) references other offenses (in this case, arson), and when "there is more than one such other offense" (as there is here), the *most serious such offense is to be used*. *See PSR at ¶ 52*; footnote 4. Further, where Mr. Giannakakis's guideline calculation already uses the most serious arson offense to start his offense level calculation at an offense level of 24, *see PSR at ¶ 52*, adding grouping points in this context would be inappropriate.

---

[15]    The Government cites *United States v. Gonzalez* to support its proposition that the underlying arson offenses in this case should trigger an additional grouping points increase. *Gonzalez*, unlike the instant matter, involved separate and distinct underlying offenses of armed robbery and armed carjacking, that were grouped separately because each distinct underlying offense "resulted in different harms". *United States v. Gonzalez*, 449 F. App'x 841, 844 (11th Cir. 2011). Pursuant to Application Note 3 to USSG § 1B1.5, this grouping calculation is in error.

iii.     The Sentencing Guidelines for Mr. Giannakakis in Context

Under Probation's calculation of the guidelines, Alexander's suggested guideline range is 18-24 months. *See PSR* at ¶ 108. Without the two-point enhancement under § 3C1.1, the suggested guideline range is 12-18 months.[16] Mr. Giannakakis acknowledges both calculations are premised on his lack of any prior U.S. criminal history, placing him in criminal history category I and triggering a two-point 'zero-point offender' reduction under USSG §§4C1.1(a) and (b). *See PSR* at 61. However, even taking into account Mr. Giannakakis's Swedish weapons offense conviction from 2022 (which, were it scorable, would yield three criminal history points under §4A1.1(a) and place him in criminal history II) and correspondingly discounting the two-point reduction under USSG §§4C1.1(a) and (b), Mr. Giannakakis' guideline range would be 27-33 months (or 21-27 months without the two-point enhancement under § 3C1.1).

Under either calculation, the requested sentence of thirty-six months incarceration remains "sufficient, but not greater than necessary" given the nature of Mr. Giannakakis' offense, his own personal history, and other reasons properly considered under 18 U.S.C. §3553(a).

**4.  A Just Sentence for Mr. Giannakakis**

Sentencing is a case- and defendant-specific inquiry involving the "broad, open-ended, and significantly discretionary" consideration of a number of different factors. *Martin*, 520 F.3d at 92; *see also United States v. Dixon*, 449 F.3d 194, 205 (1st Cir. 2006). As in all sentencing proceedings, the Court's determination comes down to deciding what punishment is fair, necessary, and appropriate, given all the relevant facts and circumstances. "Imposing a sentence on a fellow human being is a formidable responsibility," compelling "a court to consider, with

---

[16]     Based on a criminal history I and a total offense level of 13.

great care and sensitivity, a large complex of facts and factors." *United States v. Gupta,* 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012). The Court must conduct a "more holistic inquiry" than simply plugging numbers into a guidelines calculation, and "section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overarching principle." *United States v. Yonathan Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008) (citing *Kimbrough v. United States*, 128 S.Ct. 558, 570 (2007)). That overarching principle is to "impose a sentence sufficient but not greater than necessary." *Id*. In reaching a decision on what constitutes an appropriate sentence, the district court should "consider all the relevant factors" and "construct a sentence that is *minimally sufficient* to achieve the broad goals of sentencing." *Id.* (emphasis added).

In addition to consideration of other §3553(a) factors, such as the nature and circumstances of the offense, Alexander's history and characteristics, and the guideline sentencing range, all addressed above, the Court must fashion a sentence that satisfies the four needs a sentence must fulfill. Put simply, those needs are: punishment, deterrence, incapacitation, and rehabilitation. *See* 18 U.S.C. §3553(a)(2). The requested sentence of 36 months incarceration fulfills those needs. The most salient factors of §3553(a) are discussed below.

The first purpose of sentencing is to "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." Certainly this case is serious, and Alexander acknowledges and understands real people were affected by the actions he took in this case. The very experience of being charged in a federal criminal case, of being separated from his mother and young daughter, have weighed heavily on Alexander for the last 36 months. He has felt the severity and gravity of this case and prosecution in a powerful and impactful way. For Alexander, who before his arrest in this case had no prior criminal history, who had never

served a day in jail, let alone been convicted of a crime, the experience of being prosecuted federally, and the fact that he will live with these felony convictions forever, serves to reflect the seriousness of the offense and promote respect for the law.

When considering what 'just punishment' means for Alexander, the long-lasting negative impact of his federal convictions in this case also warrants consideration. A felony conviction changes one's status forever. It comes with significant collateral consequences. Were he to stay in the U.S., his rights to vote, to serve on a jury, to obtain federal loans, and to obtain many federal benefits will be restricted temporarily or removed permanently. Even when he returns home to Sweden, both his felony convictions and the publicity of his case (related to his brother's offenses) which lives in perpetuity online, realistically creating obstacles for him both personally and professionally. Courts have recognized the stigma of a felony conviction constitutes punishment in and of itself. *See Prosperi*, 686 F.3d at 48 ("Sometimes [courts do not] fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed" ); *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment of the defendant"); *United States v. Smith,* 683 F.2d 1236, 1240 (9th Cir. 1982) ("The stigma of a felony conviction is permanent and pervasive."); *see also* Wayne A. Logan, "*Informal Collateral Consequences*," 88 Washington Law Review 1103 (2013) ("Today, convict status serves as a perpetual badge of infamy, even serving to impugn reputation beyond the grave."). His convictions in this matter will impact him in countless ways, affecting his ability to find employment, to pursue higher education, and to obtain professional licensing (if he continues to pursue his goal of becoming a medical doctor or dentist). Alexander has experienced, and will experience, punishment for his

crimes in ways that go beyond the sentence this Court will impose, and that should be considered in determining what additional punishment is appropriate here.

Throughout the pendency of this case, Alexander has shouldered grave concern for the negative impact his prolonged separation and incarceration will have on his mother and young daughter. His separation from them has weighed heavily on his psyche. It goes without saying that his fears are not unfounded, and his mother, and in particular, his young daughter do suffer without him in their lives. Numerous studies have shown the effect that incarceration has on children.[17] Even government-sponsored studies recognize the need for alternatives to incarceration that minimize the damage suffered by children, reduce recidivism, and increase family preservation.[18]

In fashioning his sentence, the Court can properly consider the effect an extended period of incarceration would have on his daughter and his family, as, unquestionably, his absence serves to widen a gaping hole in their lives. His family respectfully requests that the Court consider both their need to have Alexander returned to them and their support of him when

---

[17]     *See* Anne R. Traum "*Mass Incarceration at Sentencing*," 64 Hasting Law Journal 423, 433 (2013) ("Incarceration isolates parents from their children, removes financial and caregiving support for the children, and imposes on the family the cost, time, and stress of maintaining a relationship with an incarcerated parent.") "Associated sociological and criminological theories point to three prominent ways in which the effects of parental imprisonment on the social capital of children might be understood. These involve the strains of economic deprivation, the loss of parental socialization through role modeling, support, and supervision, and the stigma and shame of societal labeling." John Hagan and Ronit Dinovitzer, "*Collateral Consequences of Imprisonment for Children, Communities, and Prisoners*". Crime and Justice, vol. 26 (1999), 121-162, 123. "The financial difficulties and loss of a parent precipitate a range of emotional and psychological problems that affect these children, including educational failures, aggression, depression, and withdrawal*." Id*. at 137-138.

[18]     Ross D. Parke & K. Alison Clarke-Stewart, *Effects of Parental Incarceration on Young Children* (Dec. 2001) (commissioned by U.S. Dept. of Health and Human Services as part of its From Prison to Home: The Effect of Incarceration on Children, Families and Communities project); Child Welfare League of America, Parents in Prison: Children in Crisis (1997).

imposing a sentence. *See, e.g.*, *Martin*, 520 F.3d at 93 (finding a downward deviation from the GSR reasonable where it was based on the defendant's relationships with his family and their support, noting "the record is replete with letters from family and friends attesting to the defendant's virtues as a father, and the district court had the opportunity to see the devotion of the defendant's family members"); *United States v. Lacarubba, 184 F. Supp. 2d 89, 99 (D. Mass. 2002)*(considering defendant's family responsibilities of caring for his sick wife and elderly mother when sentencing him below GSR).

Further, the requested sentence will afford both adequate specific and general deterrence. As for specific deterrence, Alexander will never make such grave errors of judgement again. No one could credibly claim that Alexander will ever again place himself situation where he could risk arrest and prosecution, given his experiences here and his prior lifetime of lawful behavior. A carceral sentence beyond the requested thirty-six months provides no additional benefit in that regard. Indeed, as someone with minimal criminal history, Alexander naturally has a very low risk of recidivism and it is in fact likely that his arrest, prosecution, incarceration for the last three years, and his convictions in this matter have already been deterrence enough.

As to general deterrence, no one examining Alexander's situation and prosecution would think he "got away with" anything if he were to receive the requested sentence. He has suffered and will continue to suffer devastating personal, familial, and professional collateral consequences. And to the extent this case gets any attention from members of the public, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[19] For general deterrence purposes, others observing this case will see that

---

[19]    Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).

Alexander was prosecuted and convicted, that he lost his reputation in the community, that he was separated from his family and young daughter, that his career ambitions and opportunities have been derailed. Others will know from the bitter lesson he has learned that they need to avoid situations in which Alexander placed himself in.

### Conclusion

Alexander is deeply remorseful, regrets his crime, and recognizes he deserves to be punished. In light of the § 3553(a) factors as discussed above, which ultimately call for a sentence that is "sufficient, but not greater than necessary to serve the purposes of sentencing," and the relevant Sentencing Guidelines provisions, a sentence of 36 months incarceration will appropriately accomplish the purposes of sentencing.

Respectfully submitted,

Mr. Alexander Giannakakis,
By His Attorney,

*/s/ Forest O'Neill-Greenberg*
Forest O'Neill-Greenberg
BBO#674760
Federal Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
Tel: 617-223-8061

### CERTIFICATE OF SERVICE

I hereby certify this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies sent to those indicated as non-registered participants on March 6, 2025.

*/s/ Forest O'Neill-Greenberg*
Forest O'Neill-Greenberg

23